Tami **JERNIGAN and Jennifer Haller, Plaintiffs,**

v.

**ALDERWOODS GROUP, INC.,** dba **Young's Funeral Home, Alderwoods (Oregon), Inc., and Bob Baker, individually, Defendants.**

Civil No. 05–1420–PK.

United States District Court, D. Oregon.

May 21, 2007.

1184

Craig A. Crispin, Shelley D. Russell, Crispin Employment Lawyers, Portland, OR, for Plaintiffs.

David G. Hosenpud, Leah C. Lively, Lane Powell, PC, Alan M. Scott, Galton Scott & Colett, LLP, Portland, OR, for Defendants.

## ORDER

MARSH, District Judge.

Magistrate Judge Paul Papak filed his Findings and Recommendation on

April 4, 2007. The matter is now before me pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b). When either party objects to any portion of the Magistrate's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the Magistrate's report. *See* 28 U.S.C. § 636(b)(1)(C); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.*, 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied*, 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

Plaintiffs have filed timely objections. I have, therefore, given the file of this case a *de novo* review.

I find no error. Accordingly, I ADOPT the Findings and Recommendation # 70 of Magistrate Judge Papak. Defendants' Motion for Summary Judgment (# 26) is granted with respect to Haller's claim for sexual harassment under Title VII and Oregon law, both plaintiffs' claims for retaliation under Title VII and Oregon law, both plaintiffs' claims for wrongful discharge, and negligent supervision and retention. Defendants' Motion for Summary Judgment (# 26) is denied with respect to Jernigan's claim for sexual harassment under Title VII and Oregon law. Defendants' Motion for Summary Judgment on plaintiffs' claim for punitive damages is denied. Defendant Bob Baker is dismissed from this case. Defendants' Motion to Supplement the Summary Judgment Record (# 60) and plaintiffs' Motion to Strike the Declaration of Guinevere Jones (# 64) are denied as moot. Defendants' Motion to Strike Plaintiffs' Evidence in Support of Opposition to Motion for Summary Judgment (# 49) is granted in part and denied in part as follows: objections to Exhibits

51, 52, 55 and 61 are sustained; all other objections are overruled.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATION/ORDER

PAPAK, United States Magistrate Judge.

Plaintiffs Tami Jernigan ("Jernigan") and Jennifer Haller ("Haller") are former employees of defendant Alderwoods Group, Inc. ("Alderwoods"). Jernigan and Haller worked at Young's Funeral Home ("Young's"), which was owned by Alderwoods. Defendant Bob Baker ("Baker") was the Location Manager at Young's during plaintiffs' employment.[1] Haller and Jernigan filed suit on September 13, 2005, claiming sexual harassment and retaliation under Title VII and Oregon law, wrongful discharge, and negligent supervision and retention. Haller also filed a claim for sexual battery that she voluntarily dismissed at oral argument. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

Before this court are defendants' Motion for Summary Judgment (# 26) on all plaintiffs' claims, including their claims for punitive damages, defendants' Motion to Strike Plaintiffs' Evidence in Support of Opposition to Motion for Summary Judgment (# 49), defendants Motion to Supplement the Summary Judgment Record (# 60), and plaintiffs' Motion to Strike the Declaration of Guinevere Jones (# 64). For the reasons set forth below, defendants' motion for summary judgment should be granted in part and denied in part. Defendants' motion to strike is granted in part and denied in part as specified below. Defendants' motion to

---

**1.** Baker was only named as a defendant in the Sixth Claim for Relief, Haller's claim of sexual battery.

supplement the summary judgment record is denied as moot, and plaintiffs' motion to strike is denied as moot. Defendant Baker should be dismissed from this lawsuit.

### LEGAL STANDARD

A party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).

The moving party carries the initial burden of proof. The party meets this burden by identifying portions of the record on file which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the initial burden is satisfied, the burden shifts to the nonmoving party to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Id.*

The court must view the evidence in the light most favorable to the non-moving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir.1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir.1976). The inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir.1989). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of N. America.*, 638 F.2d 136, 140 (9th Cir.1981).

■ The Ninth Circuit has set a high standard for granting summary judgment in ' employment discrimination cases. *Schnidrig v. Columbia Machine, Inc.*, 80 F.3d 1406, 1410 (9th Cir.), *cert. denied*, 519 U.S. 927, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996) (courts should require very little evidence to survive summary judgment in a discrimination case, because ultimate question is one that can be resolved only through searching inquiry that is most appropriately conducted by the fact-finder, upon a full record).

■ However, deference to the non-moving party does have some limit. The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Self-serving affidavits will not establish a genuine issue of material fact if they fail to state facts based on personal knowledge or are too conclusory. *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir.2001). The "mere existence of a scintilla of evidence in support of the [non-moving party's] position would be insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### STATEMENT OF FACTS

*Background*

Alderwoods operates funeral homes and cemeteries in North America. One of Alderwoods' funeral homes is Young's, located in Tigard, Oregon. Young's employed Funeral Directors, a Local Administrator, pre-need salespeople, and a Location Manager. Funeral Directors, Location Administrators and pre-need salespeople are equal positions organizationally. The Lo-

cation Manager supervised the Funeral Directors and Location Administrators. A Sales Manager supervised the pre-need salespeople, but did not necessarily work at the Young's location.[2] For clarity, the following graphic demonstrates the relevant part of the organizational structure of Alderwoods:

Robert Baker ("Baker") was the Location Manager at Young's from March 1996 until May 10, 2004, when he was terminated. Chris Waud ("Waud"), Bob Cafferky ("Cafferky"), and Ernest Gatchell ("Gatchell") were Funeral Directors at Young's. Joseph Kluempke ("Kluempke") was a Sales Manager for Alderwoods from 2001 until April 10, 2005.

Alderwoods published and disseminated an Employee Handbook ("the Handbook"). The Handbook referred to a section in Alderwoods' Policy Manual entitled "Respectful Workplace", ("the Policy"), which included a section on sexual harassment. The Policy defined sexual harassment with examples. The Policy set forth a reporting structure for complaints of sexual harassment, and stated that it was a violation of the Policy to retaliate against an employee making a complaint of sexual harassment. Jernigan and Haller received the Handbook and read the Policy on sexual harassment. Haller knew she could report sexual harassment to her immediate supervisor or to Human Resources, a Vice President, or the company helpline if the complaint involved her supervisor. Jerni-

gan knew she could report sexual harassment to Human Resources if the allegation involved her supervisor.

*Jernigan*

On January 31, 2002, Alderwoods hired Jernigan to work as a pre-need salesperson at Young's. Kluempke was Jernigan's supervisor. Kluempke's supervisor was Brett Edgerly ("Edgerly"), Alderwoods' General Market Manager.

On January 15, 2003, Kluempke disciplined Jernigan for poor performance. In August 2003 and April 2004, Jernigan received certificates for meeting sales goals of $100,000 from the Mayflower National Life Insurance Company, a company affiliated with Alderwoods.

Kluempke informed Jernigan when she began working at Young's that Baker was "sexual" and that his jokes got "out of hand." During her employment at Young's, Baker asked Jernigan on four or five occasions if she was wearing a camel hair sweater and when she told him she did not know, he stated "because I can see your humps." Jernigan reported this comment to Kluempke on one occasion, but he

---

**2.** Kluempke, the Sales Manager for Young's, was not physically located at Young's.

took no action in response. She did not report the behavior to Human Resources.

On December 12, 2003, Jernigan fell down the stairs at work. While she was pulling up her pants leg to check her injury, Baker asked her if she wanted to pull down her pants so that he could see if she was injured. Jernigan reported this comment to Kluempke.

In February 2004, Baker once commented to Jernigan, "I do the willing once and easy women twice, which one are you [?]" When Jernigan replied "okay," Baker said "I love it when you turn red." Jernigan reported this comment to Kluempke. On one occasion in 2004, Baker commented to Jernigan, "[w]hy don't you jack me off." Jernigan reported this comment to Kluempke. On another occasion Baker pulled a string-tie on Jernigan's blouse, exposing her breasts. In March 2004, when Jernigan said she was cold, Baker responded that he would warm her up. In March 2004, Baker remarked that Jernigan was beautiful or gorgeous. Twice in 2004 Baker commented to Jernigan, "I know you are an animal, you wanna get a room?" Three times between 2002 and 2004 Baker asked Jernigan, "[C]an I afford you?" Baker asked Jernigan to, "Come over and sit on my lap." Baker also commented to Jernigan, "You must be one hot mama in the bedroom." When Jernigan commented that her boyfriend was not treating her right, Baker told Jernigan that he considered her still to be available for dating and if she would not tell her boyfriend about Baker, he would not tell the boyfriend either. Baker rubbed Jernigan's shoulders and brushed up against her at work, telling her she was voluptuous.

In addition to reporting Baker's conduct to Kluempke on the previously mentioned occasions, Jernigan also attempted to complain to Edgerly in late 2002 or early 2003, but she did not specify that she needed to speak to him regarding allegations of sexual harassment. Edgerly responded that she needed to go through her supervisor, Kluempke, and when Jernigan indicated that her supervisor was the subject of her need to talk with Edgerly, he responded that she still needed to go through Kluempke before he spoke with her.

In addition to Baker's harassment, Jernigan claims that two male coworkers, Waud and Gatchell, sexually harassed her. Jernigan claims Waud sexually harassed her by jiggling the restroom door handle on a unisex bathroom when she was using it. Jernigan admits that because she could not see him, she does not know if it was Waud jiggling the handle. Waud commented more than once, both positively and negatively, on the color of Jernigan's hair. Jernigan admits that she frequently changed her hair color. Waud swore in Jernigan's presence, but she admits that none of Waud's comments had sexual connotations. Jernigan reported to Kluempke that Waud intentionally jiggled the restroom door handle when she was using the restroom, but did not report any of his other behavior.

Jernigan also claims that Gatchell jiggled the unisex restroom door handle while she was using the restroom though she cannot be sure it was Gatchell jiggling the handle each time. On one occasion, Gatchell opened the restroom door a crack while it was occupied by Jernigan and then immediately closed the door. On two occasions Gatchell called Jernigan stupid. Gatchell also stated that he "hated" Jernigan, but later apologized. Gatchell once said Jernigan was sexy. In 2002, Gatchell commented that Jernigan did not belong in the funeral business and that the business was better before women were involved. Jernigan complained of Gatchell's behavior to Kluempke but did not report any of his conduct to Alderwoods Human Resources.

*Haller*

On July 23, 1996, Baker hired Haller to work as a secretary/bookkeeper for the Loewen Group, Alderwoods' predecessor in name. Baker was Haller's supervisor. Haller's sexual harassment claims are against Baker only. Haller claims that Baker directed profane language towards her, and that she told Baker that his jokes were inappropriate. On approximately five occasions Baker said to Haller, "Come sit on my lap and we'll see what pops up." Approximately five times, when she said her hands were cold, Baker asked Haller to put them between his legs to warm them up. Baker asked Haller to snuggle with him saying, "Maybe we'll figure out something to do from here-or from there." Approximately five times, when Baker and Haller would leave for lunch, Baker would announce that they were getting a hotel room. On two occasions Baker stated to Haller, "I know you are an animal, wanna get a room?" On more than five occasions, beginning in 2000, when Haller would say she was cold, Baker would respond, "Come over here and I will warm you up." Twice Baker tried to grab and hold Haller's hand. On a few occasions, Baker commented that he would give Haller "mouth to breast resuscitation." Baker once asked Haller to lift up her shirt so he could suck on her nipple. Baker twice introduced Haller as his "sexitary." Between five and ten times when Haller commented that she was not feeling well, Baker asked to feel her. Baker jiggled the door handle on the unisex restroom when women were using it. On less than five occasions, Baker hugged and attempted to kiss Haller. Baker told others that he and Haller were having an affair, and told Haller he was in love with her.

Defendants claim that Haller made no reports of sexual harassment to anyone at Alderwoods before March 2004. Haller states that she attempted to report sexual harassment to Craig LaFollette, Alderwoods Regional General Manager at the time, but that Craig LaFollette would not allow her to meet with him without Baker being present. As a result of Baker's presence at the resultant meeting, Haller complained about other work conditions, but did not specifically complain about sexual harassment by Baker.

*Investigation and Aftermath*

On or about March 17 or 18, 2004, Jernigan and Haller complained of sexual harassment to Alderwoods' Human Resources Department. Plaintiffs claimed that Baker made several sexually harassing comments to them. Jernigan did not allege that Baker had ever touched or attempted to touch her in any manner. Sexual harassment by Baker of Jernigan and Haller ceased from that point forward.

Following the complaint by Jernigan, Alderwoods formed a committee to investigate plaintiffs' claims. The committee was formed by Jeff James ("James"), Alderwoods' Human Resources Specialist, and consisted of James, Sandra Walker, a Location Administrator for Alderwoods in Seattle, and Andrea Stout, a paralegal from Alderwoods' legal department in Ohio. During the investigation, Haller and Jernigan approached James with the concern that the confidentiality of the investigation had been breached because there was talk occurring in the workplace about the investigation. At least one employee may have suspected that he was being interviewed as a result of some actions by Haller and Jernigan.

Haller and Jernigan both complained to the committee that Baker had made sexually inappropriate comments to each of them. The investigation revealed that Baker allowed sexual jokes in the workplace and made inappropriate sexual comments and jokes. The investigation also revealed the following: that Waud lost his

temper, yelled, and swore in the workplace in violation of the Policy; that Haller got upset and yelled at other employees in the workplace in violation of the Policy; and that Cafferky and another employee, Dan Raney ("Raney"), violated the confidentiality of the investigation by discussing their interviews and other aspects of the investigation with each other.[3]

The investigation committee recommended that Baker be terminated for violating the Policy, and that Waud, Haller, Cafferky, and Raney be disciplined.[4] Cafferky received a three-day suspension without pay. Waud, Haller and Raney each received written reprimands. As a result of the investigation, a decision was made to transfer Waud, however Waud was never told he would be transferred, and no transfer occurred.

On May 10, 2004, Regional General Manager John Head ("Head") terminated Baker. Employees at Young's were told of Baker's termination but were not given the reasons for it. On that same day, Head wrote letters to Haller and Jernigan thanking them for bringing the Policy complaint against Baker.

Both Jernigan and Haller claim they were subject to retaliation following the March 2004 complaint of sexual harassment to Human Resources. Jernigan alleges that Waud and Location Administrator Lisa Riggleman ("Riggleman") redirected four sales calls intended for Jernigan to others at Alderwoods. Jernigan also claims that another pre-need salesperson received four sales calls that Jernigan should have received. Waud and Riggleman allegedly gave Jernigan the "cold shoulder."[5] After the investigation, Kluempke drafted a Performance Improvement Plan for Jernigan, dated April 12, 2004. However, Kluempke never gave the plan to her.

Following the complaint of sexual harassment, Baker gave Haller the "silent treatment" and gave her expense reports to prepare that she previously had not been asked to do. Haller admitted that she offered to prepare the expense reports. Baker handed out training materials ahead of time to other employees but not to Haller, although Haller admits that she received the materials at the training.

Haller claims that Alderwoods' employees retaliated against her after the investigation and Baker's termination. First, Haller claims that David LaFollette ("La-Follette"), Baker's replacement, gave a project of hers to Riggleman to complete. Also, Karen Franklin, Alderwoods' Market Administrator, found fault with Haller's work and Haller did not agree with Franklin's assessment of her work. When he was her supervisor, Baker found Haller's work to be very good. On one occasion after Baker's termination, a family called in for Haller at Young's and was told that she was out when she was actually in the office, though Haller admits that she was able to speak with the family the next day. Haller claims her coworkers "shunned" her throughout her employment with Alderwoods. Haller complained about what she considered to be acts of retaliation to LaFollette after Baker's termination and

---

3. Cafferky also would not cooperate in the investigation in that he refused repeated requests for information regarding specific events he witnessed at Young's.

4. Gatchell no longer worked at Young's at the time of the investigation.

5. Jernigan also claims that following the investigation, Baker initially rejected a pur-

chase order for Jernigan's continuing education, an expense that Alderwoods ultimately paid. However, at the time of this rejection, Baker did not know that Jernigan had filed a sexual harassment complaint against him. Baker's action, therefore, would not support Jernigan's claim of retaliation.

claims that LaFollette took no action in response. However, on or about June 11, 2004, LaFollette faxed a letter Haller had written about retaliation at Young's to Head and Edgerly at Alderwoods' corporate headquarters. LaFollette did not investigate Haller's claims himself.

In May 2004, James conducted a respectful workplace training at Young's regarding sexual harassment. Haller and Jernigan contend that it was not related to the investigation and termination of Baker.

On May 10, 2004, David LaFollette replaced Baker as Location Manager at Young's. When he arrived, LaFollette was not aware that Haller or Jernigan had made sexual harassment complaints or that Baker's termination was based on such complaints. LaFollette instituted an 8 a.m. start time for all employees at Young's. When Haller asked to be allowed to arrive later than 8 a.m., he honored her request. LaFollette believed Haller was "carrying baggage" from her experience at Young's prior to his arrival. LaFollette noticed Haller was having difficulty at work, including not being dependable, arriving late, leaving early, not getting her work done, and being tearful. When LaFollette asked her about this behavior, she said he did not understand what happened at Young's before he arrived. LaFollette told Haller he did not want to know what happened at Young's before his arrival and that he wanted to move forward. LaFollette discussed Haller's performance with Head. Part of LaFollette's job responsibility as Haller's manager was to keep notes regarding her performance, attendance, and interactions with coworkers.

On May 20, 2004, Jernigan took leave from Alderwoods for medical reasons. She requested vacation pay during her leave and was refused. Alderwoods contends that company policy did not allow for vacation pay during medical leave. She never returned to work and resigned on August 11, 2004.

On June 11, 2004, Haller left Alderwoods and never returned to work. She resigned on September 10, 2004.

## ANALYSIS

I. Sexual Harassment under Title VII and ORS 659A.030

A. Legal Standard

 Jernigan and Haller contend that they were subjected to a hostile work environment during their employment at Young's. A hostile work environment exists under both Title VII and Oregon law [6] when an employee shows (1) that she was subjected to verbal or physical conduct of a harassing nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an intimidating, hostile, offensive, or abusive working environment. *Pavon v. Swift Transp. Co., Inc.*, 192 F.3d 902, 908 (9th Cir.1999), citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Fred Meyer, Inc. v. Bureau of Labor and Indus.,* 152 Or.App. 302, 307, 954 P.2d 804 (Or.Ct.App. 1998). In addition, the employee must show that the harassment was "because of sex." *Nichols v. Azteca Restaurant Enters., Inc.,* 256 F.3d 864, 872 (9th Cir.2001)

---

6. Because ORS 659A.030 is patterned after Title VII, both Oregon and federal courts have considered federal Title VII law caselaw instructive when construing state law. *Montgomery v. J.R. Simplot Co.,* 916 F.Supp. 1033, 1038 (D.Or.1994), *aff'd,* 76 F.3d 387, 1996 WL 29257 (9th Cir.1996); *Harris v. Pameco*

*Corp.,* 170 Or.App. 164, 176, 12 P.3d 524 (Or.Ct.App.2000). *See also A.L.P. Inc. v. Bureau of Labor and Industries,* 161 Or.App. 417, 422, 984 P.2d 883 (Or.Ct.App.1999) ("ORS 659.030 is patterned after Title VII and that we therefore consider federal cases instructive.").

(citations omitted). In determining whether the alleged conduct was sufficiently hostile or abusive, the court must examine all the circumstances, including the frequency of the alleged discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, or mere offensive utterances, and whether the conduct unreasonably interfered with an employee's work performance. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270–71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citations omitted). Simple teasing, offhand comments, or isolated incidents, unless very serious, do not show discriminatory changes in the terms and conditions of employment. *Id.* at 271, 121 S.Ct. 1508 (citations omitted). Whether the workplace is objectively hostile is determined from the perspective of a reasonable person with the same fundamental characteristics as the plaintiff. *Crowe v. Wiltel Commun. Sys.*, 103 F.3d 897, 900 (9th Cir.1996); *see also Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir.1991) ("reasonable person" in sexual harassment case brought by female plaintiff is a reasonable woman).

## B. Supervisor Misconduct

### 1. Hostile Work Environment

■ Jernigan and Haller contend that Baker's actions created a hostile work environment at Young's. Alderwoods argues that Baker's conduct was not sufficiently severe, frequent or pervasive for a reasonable woman to find it objectively offensive. This court disagrees. Without reciting the litany of sexually explicit comments and jokes made by Baker as set forth in the factual statement, this court finds sufficient evidence from which a reasonable factfinder could conclude that Jernigan and Haller were subjected to a sexually hostile work environment.

Alderwoods relies on *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333 (7th Cir.1993), for its argument that Baker's conduct was not sufficiently severe or pervasive to find actionable sexual harassment. However, unlike the supervisor in *Weiss,* the frequency of Baker's comments and jokes was substantially higher and occurred over a significantly longer period of time. Alderwoods' reliance on *Scott v. Sears, Roebuck and Co.,* 798 F.2d 210, 211–14 (7th Cir.1986) is also misplaced. In *Scott,* the plaintiff could only point to a handful of incidences of questionable conduct by a male supervisor and male coworkers, and the plaintiff admitted that she considered the supervisor her friend. *Id.* at 214 (finding conduct of which plaintiff complained too isolated and lacked the repetitive effect necessary to maintain a hostile environment claim).

Alderwoods also argues that because Baker made no physically threatening comments to Jernigan and Haller and because Jernigan and Haller were able to continue performing their jobs at Young's, they have failed to show that Baker created a hostile work environment. Alderwoods misinterprets the requirements for violation of Title VII: hostile environment sexual harassment is unwelcome verbal or physical conduct that "unreasonably interfer[es] with an individual's work performance or creat[es] an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a)(3) (emphasis added). Plaintiffs need not show that Baker physically threatened them. Nor are they required to show that Baker's conduct made it impossible for them to perform their duties at Young's.

Considering all of the allegations of misconduct by Baker, Jernigan and Haller have presented sufficient evidence that the frequency, severity and humiliating nature of Baker's actions may have been objectively offensive to a reasonable person, and may have unreasonably interfered with each plaintiff's work performance. *See*

*Clark County School Dist. v. Breeden,* 532 U.S. 268, 270–71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (court must examine all circumstances to determine if alleged conduct is actionable). Alderwoods' claims that plaintiffs were not subjected to a sexually hostile work environment as a matter of law should be denied.

### 2. *Ellerth/Faragher* Affirmative Defense

Alderwoods argues that even if Baker's conduct subjected Jernigan and Haller to a hostile work environment, it is entitled to summary judgment based on the affirmative defense described in *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

#### a. Tangible Employment Action

In *Ellerth* and *Faragher,* the Supreme Court held that an employer is strictly liable for supervisor harassment that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *accord Faragher,* 524 U.S. at 808, 118 S.Ct. 2275. But when no tangible employment action is taken, the employer may raise an affirmative defense to liability, subject to proof by a preponderance of the evidence. *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *accord Faragher,* 524 U.S. at 808, 118 S.Ct. 2275. "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Pennsylvania State Police v. Suders,* 542 U.S. 129, 137–38, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004), citing *El-*

*lerth,* 524 U.S. at 765, 118 S.Ct. 2257, and *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275.

In *Suders,* the Supreme Court addressed the question of whether the *Ellerth/Faragher* defense is available when a plaintiff claims wrongful constructive discharge. The Court held that a constructive discharge is not in and of itself a tangible employment action, and that the *Ellerth/Fargher* affirmative defense is, therefore, available in cases of constructive discharge where the discharge was not precipitated by a tangible employment action. *Id.* at 140–41, 124 S.Ct. 2342.

In its opinion, the Court pointed to two circuit court cases that correctly applied the Court's holding: *Reed v. MBNA Marketing Systems, Inc.,* 333 F.3d 27 (1st Cir. 2003), and *Robinson v. Sappington,* 351 F.3d 317 (7th Cir.2003), *cert. denied,* 542 U.S. 937, 124 S.Ct. 2909, 159 L.Ed.2d 813 (2004). In *Reed,* the plaintiff claimed a constructive discharge based on her supervisor's repeated sexual comments and an incident in which he sexually assaulted her. The First Circuit held that the alleged wrongdoing did not preclude the employer from asserting the *Ellerth/Faragher* affirmative defense. The Court noted that in *Reed,* the supervisor's behavior involved no official actions. In *Robinson,* after the plaintiff complained that she was sexually harassed by the judge for whom she worked, the presiding judge decided to transfer her to another judge, but told her that "her first six months [in the new post] probably would be 'hell,'" and that it was in her "'best interest to resign.'" *Id.* at 324. The Seventh Circuit held that the employer was precluded from asserting the affirmative defense to the plaintiff's constructive discharge claim. The *Robinson* plaintiff's decision to resign, the Seventh Circuit explained, "resulted, at least in part, from [the presiding judge's] official actions in transferring" her to a judge who

resisted placing her on his staff. *Id.,* at 337. The Supreme Court stated, "[t]he courts in *Reed* and *Robinson* properly recognized that *Ellerth* and *Faragher,* which divided the universe of supervisor-harassment claims according to the presence or absence of an official act, mark the path constructive discharge claims based on harassing conduct must follow." *Suders,* 542 U.S. at 150, 124 S.Ct. 2342. In order to prevail on this affirmative defense, Alderwoods must show that Jernigan and/or Haller did not suffer a tangible employment action. If there was no tangible employment action, Alderwoods must then show that it exercised reasonable care to prevent and to correct harassment promptly, and that Jernigan and/or Haller unreasonably failed to use Alderwoods' complaint procedure. *See Ellerth,* 524 U.S. at 764, 118 S.Ct. 2257.

Alderwoods argues that Jernigan and Haller do not specify any particular conduct by Alderwoods that would constitute a tangible employment action. After careful review of the record, this court agrees.

■ "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257. Unlike injuries that can equally be inflicted by a co-worker or supervisor, tangible employment actions are those actions within the special province of supervisors:

> When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. A tangible employment action in most cases inflicts direct economic harm. As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury. A co-worker can break a co-worker's

arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her offensive conduct. But one co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one coworker demote another. Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control. Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors. The supervisor often must obtain the imprimatur of the enterprise and use its internal processes. For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer.

*Ellerth,* 524 U.S. at 761–62, 118 S.Ct. 2257 (internal citations omitted).

■ Plaintiffs cite no caselaw and this court can find none that would support an interpretation of any Alderwoods' actions as a tangible employment action with regard to either Jernigan or Haller. Because neither Jernigan nor Haller was subjected to a tangible employment action, Alderwoods may avail itself of the *Ellerth/Fargher* affirmative defense.

b. Reasonable Care by Alderwoods

■ Alderwoods argues that it exercised reasonable care to prevent and correct promptly workplace harassment, the first prong of the *Faragher/Ellerth* de-

fense. In *Montero v. AGCO Corp.*, 192 F.3d 856, 862 (9th Cir.1999), the court held that the first prong of the affirmative defense was satisfied because the employer had a policy prohibiting sexual harassment. The policy defined sexual harassment, identified who employees should contact in the event they were subjected to sexual harassment, described the disciplinary measures the company could utilize in the event harassment occurred, and included a statement that retaliation would not be tolerated. *Id.* Alderwoods point out that its "Respectful Workplace" Policy embodied the elements laid out in *Montero*, that the Policy was disseminated to all employees, including plaintiffs, that the Policy included a complaint procedure at Alderwoods for reporting sexual harassment, and that the Policy included a statement that it was a violation of the Policy to retaliate against anyone claiming sexual harassment. Furthermore, Alderwoods claims it initiated a prompt investigation upon plaintiffs' report of sexual harassment in March 2004.[7] *See Swenson v. Potter*, 271 F.3d 1184, 1193 (9th Cir.2001) (explaining the importance of rapid response and investigation to an employee's sexual harassment complaint in a company's exercise of reasonable care).

Plaintiffs argue that Alderwoods did not exercise reasonable care because it did not conduct regular trainings on its anti-harassment policy. Alderwoods held a Respectful Workplace Policy training in May 2004. Waud testified that trainings were held annually. *See* Exh. 32 to Alderwoods' Reply, Waud Dep. at 61:15–22. Baker testified that he attended more than one Respectful Workplace Policy training during his employment at Alderwoods. *See* Exh. 4 to Alderwoods Memo in Support, Baker Dep. at 21:1–7. In any event, courts have not found an employer's effort to prevent

and correct workplace harassment unreasonable based on a lack of workplace training. *See Holly D. v. California Institute of Technology*, 339 F.3d 1158, 1177 (9th Cir.2003) (employer's efforts to prevent and correct harassment should be evaluated as a whole and not based on whether additional measures would have been reasonable if utilized).

Plaintiffs argue that Alderwoods did not exercise reasonable care in leaving Baker in his supervisory position during the eight weeks between the time plaintiffs complained to Alderwoods Human Resources and Baker's termination on May 10, 2004. However, plaintiffs admit that the sexual harassment ceased from the time Human Resources learned of the allegations. *See Mikels v. City of Durham N.C.*, 183 F.3d 323, 330 (4th Cir.1999) (courts afford great weight to employer's response that was demonstrably adequate to cause cessation of harassing conduct). Also, Alderwoods immediately intervened and disciplined employees when Jernigan and Haller alleged that the confidentiality of the investigation had been breached. Because plaintiffs provide no evidence that harassment continued during the investigation, this court cannot find that Alderwoods failed to exercise reasonable care by leaving Baker in his position during the investigation.

Plaintiffs also argue that Alderwoods should have given management and staff more information regarding the nature of Baker's termination, specifically that he had been terminated for violating the company's sexual harassment policy. However, such disclosure is not required by any legal authority. Further, Alderwoods might expose itself to liability for defamation and other possible claims by disclosing the results of a sexual harassment investigation that lead to the termination of an

---

7. Alderwoods points out that within fifteen minutes of Jernigan's report of sexual harass-

ment to James, Alderwoods began its investigation into Baker's conduct.

employee. Alderwoods had no duty to make an example of Baker as a cautionary tale for other employees.

Finally, plaintiffs point to Alderwoods failure to discipline Waud or to transfer him from Young's as an example of its lack of reasonable care. However, the investigation did not reveal that Waud was sexually harassing plaintiffs. Rather it revealed that he lost his temper, yelled, and swore in the workplace in violation of the Respectful Workplace Policy. As such, the discipline he received, a written reprimand, was related to that conduct, not plaintiffs' allegation of sexual harassment. As for his transfer, plaintiffs provide no evidence that the investigation committee's recommendation that Waud be transferred had anything to do with their allegations of sexual harassment. Therefore Alderwoods' handling of claims against Waud does not show failure to exercise reasonable care.

Because Alderwoods' Policy embodied the same elements that the Ninth Circuit found sufficient to satisfy the reasonable care standard of the *Ellerth/Faragher* defense in *Montero*, and because plaintiffs' arguments that Alderwoods did not exercise reasonable care in this situation are not supported by evidence in the record, this court finds that Alderwoods satisfied the first prong of the affirmative defense.

c. Unreasonable Failure to Avoid Harm

 The second prong of the *Ellerth/Faragher* defense requires Alderwoods to show that Jernigan and/or Haller unreasonably failed to take advantage of any preventive or corrective opportunities provided by Alderwoods to avoid harm. *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. A demonstration that the employee unreasonably failed to use any complaint procedure provided by the employer will normally satisfy the employer's burden under this element. *Id.* at 807–08, 118 S.Ct. 2275. Alderwoods argues that it had a complaint procedure for reporting sexual harassment, both plaintiffs were aware of how to report a claim of sexual harassment, including what steps to take in the event that the alleged harasser was the employee's superior, and that plaintiffs unreasonably failed to follow the complaint procedure.

*Jernigan*

Jernigan made her first official report to Alderwoods Human Resources of sexual harassment in March 2004. However, beginning in 2002, shortly after she was hired, Jernigan complained to Kluempke, her supervisor, about Baker's ongoing and offensive sexual comments and conduct. Jernigan continued reporting Baker's behavior to Kluempke for another two years. Kluempke, a management level employee, took no action in response to Jernigan's reports. Alderwoods argues that Jernigan's reports to Kluempke were not complaints of sexual harassment and that Alderwoods was not on notice of a claimed sexually hostile work environment. This court disagrees. As described above, Jernigan complained to Kluempke frequently and in detail regarding Baker's harassing conduct. Jernigan has provided sufficient evidence that she took advantage of Alderwoods complaint procedures for reporting sexual harassment. Because Alderwoods cannot show that as a matter of law Jernigan unreasonably failed to invoke the complaint procedure and avoid harm, Alderwoods does not meet the second prong of the *Faragher/Ellerth* defense. Alderwoods' motion for summary judgment on Jernigan's claim of hostile environment sexual harassment should be denied.

*Haller*

Haller made her first report of sexual harassment to management through Alderwoods Human Resources in March 2004. Haller had been employed at Alderwoods

since 1996. Haller argues that she did not make any earlier complaints to Human Resources because a co-worker told her that Human Resources was not receptive to these complaints. However, failure to report harassment to the employer's human resources department based on dissatisfaction with how other complaints were handled is not a legally sufficient reason for failing to report. *See Holly D.,* 339 F.3d at 1178–79 (plaintiff's belief that previous complaints to employee relations department were mishandled does not make reasonable her failure to report harassment to that department for two years); *see also Scrivner v. Socorro Indep. Sch. Dist.,* 169 F.3d 969, 972 (5th Cir.1999) (summary judgment for employer affirmed as to finding that eight-month delay in filing complaint was unreasonable).

Haller also argues that in March 2003, she attempted to report sexual harassment to Craig LaFollette, Alderwoods Regional General Manager at the time, but that he would not allow her to meet with him privately without Baker being present. Haller did not tell Craig LaFollette ahead of time that her reason for wanting to meet with him had to do with sexual harassment. The day before the meeting, Haller told Baker she was going to tell Craig LaFollette "everything" and Baker told her that if Haller was going to "take [him] down, [he] was going to take [her] with [him]." Exh. 1 to Russell Decl., Haller Dep. at 127:21–25. Haller was scared and intimidated by Baker's attendance and as a result of his presence at the meeting, Haller complained about other work conditions, but did not specifically complain about sexual harassment by Baker. This attempt by Haller to report harassment is insufficient.[8] Courts considering similar

circumstances have found that "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment." *Shaw v. AutoZone, Inc.,* 180 F.3d 806, 813 (7th Cir.1999), *cert. denied,* 528 U.S. 1076, 120 S.Ct. 790, 145 L.Ed.2d 666 (2000); *See also Beyer v. Baker School Dist. 5J,* No. 003–714–JE, 2005 WL 351936 at *8 (D.Or. Feb.14, 2005) ("a generalized fear of retaliation cannot justify a failure to report sexual harassment").

Because Haller unreasonably failed to utilize Alderwoods complaint procedure for reporting sexual harassment to any member of management at Alderwoods from the commencement of her employment in 1996 until her first complaint in March 2004, after which the harassment ended, Alderwoods has established the second prong of the *Ellerth/Faragher* affirmative defense. Alderwoods' motion for summary judgment on Haller's claim of hostile environment sexual harassment should be granted.

### C. Co–Worker Harassment

 Jernigan also alleges that she was sexually harassed by her co-workers, Gatchell and Waud. To prevail against an employer on a claim of co-worker harassment, the plaintiff must prove that the employer knew of should have known of the co-worker harassment and did not take adequate steps to address it. *Swinton v. Potomac Corp.,* 270 F.3d 794, 803 (9th Cir.2001), *cert. denied,* 535 U.S. 1018, 122 S.Ct. 1609, 152 L.Ed.2d 623 (2002) (citation omitted). The employer is not, however, liable for conduct of which it is unaware: "The employer's liability, if any, runs from

---

**8.** Even if Haller was concerned about disclosing harassment to Craig LaFollette in Baker's presence, she admits that she was aware she could have complained to Jeff James in Hu-

man Resources or to Vice President Sean Phillips but that she chose not to do so. Exh. 17 to Lively Decl., Haller Dep. at 120:9–25, 122:8–14.

the time it knew or should have known about the conduct and failed to stop it." *Swenson v. Potter,* 271 F.3d 1184, 1192 (9th Cir.2001) (citation omitted). Notice to the employer means notice to management or a supervisor. A supervisor is one who has authority to "hire, fire, or discipline employees, or recommend such action." *Brooks v. City of San Mateo,* 229 F.3d 917, 925 n. 6 (9th Cir.2000) (citation omitted).

 Notice triggers the employer's duty to take prompt corrective action that is "reasonably calculated to end the harassment." *Nichols,* 256 F.3d at 875 (citation omitted). This obligation consists of two parts: (1) "the temporal steps the employer takes to deal with the situation while it determines whether the complaint was justified"; and (2) "the permanent remedial steps the employer takes once it has completed its investigation." *Swenson,* 271 F.3d at 1192 (citations omitted).

The sum of Jernigan's co-worker harassment complaints are as follows: Waud and Gatchell intentionally jiggled the restroom door handle when Jernigan was using the restroom, Waud commented more than once on the color of Jernigan's hair, twice said "fuck you" in her presence, and once said "fuck her" in her hearing range. On two occasions Gatchell called Jernigan stupid. Gatchell also stated that he "hated" Jernigan but later apologized. Gatchell once said Jernigan was sexy, and he allegedly commented that she did not belong in the funeral business and that the business was better before women were involved. Jernigan reported to Kluempke that Waud and Gatchell intentionally jiggled the restroom door handle when she was using the restroom, but did not report any of the conduct to Alderwoods Human Resources.

 To be actionable under Title VII, harassment must be "because of sex." *Nichols,* 256 F.3d at 872. The plaintiff must prove "that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." *Oncale v. Sundowner Offshore Svcs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Jernigan fails to provide evidence that Waud's comments or conduct were because of sex and, in fact, admits that none of Waud's comments had sexual connotations. Exh. 13 to Lively Decl., Jernigan Dep. at 216:10–13. Similarly, while Gatchell's comments may have been unpleasant, they did not rise to the level of harassment because of sex. *See Galloway v. General Motors Serv. Parts Operations,* 78 F.3d 1164, 1167–68 (7th Cir.1996) (use of word "bitch" not necessarily motivated by gender); *see also Vore v. Indiana Bell Tel. Co.,* 32 F.3d 1161, 1162 (7th Cir.1994) (personality conflicts are not Title VII discrimination).

 Waud and Gatchell's conduct was not severe, frequent or sufficiently pervasive to create a hostile work environment. Properly applied, Title VII standards "will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Jaurrieta v. Portland Public Schools,* No. CV–00–1238–ST, 2001 WL 34041143 at *8 (D.Or. Dec.14, 2001), quoting *Faragher,* 524 U.S. at 787–88, 118 S.Ct. 2275.

 Finally, Alderwoods was not on notice of Waud and Gatchell's conduct until March 2004. Employers may be held liable for sexual harassment of an employee by the employee's coworkers when the employer knew or should have known of the alleged harassment. *See Burrell v. Star Nursery, Inc.,* 170 F.3d 951, 955 (9th Cir. 1999) (finding no liability for hostile work environment claim when employee did not report alleged coworker harassment to management). Jernigan complained to Kluempke about the door jiggling but that was not a complaint of harassment based

on sex. When Jernigan finally complained to Alderwoods in March 2004 about sexual harassment by Waud,[9] Alderwoods promptly investigated her claim and reprimanded him, although not for sexual harassment. Alderwoods took adequate measures upon learning of Jernigan's allegations against Waud. Alderwoods could not be held liable for alleged harassment by Waud or Gatchell. Alderwoods' motion for summary judgment on Jernigan's claim of coworker sexual harassment should be granted.

## II. Retaliation

### 1. Legal Standard

■■■ Jernigan and Haller argue that they were subjected to retaliation at Young's after Baker was terminated. To establish a prima facie case of retaliation under Title VII and Oregon law, Jernigan and/or Haller must show: (1) she engaged in a protected activity; (2) Alderwoods subjected her to an adverse employment action; and (3) Alderwoods' action is causally linked to the protected activity. *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir.1987). The required elements of a prima facie case are the same for plaintiffs asserting retaliation claims under Title VII and under Oregon law. *Payne v. Apollo College–Portland, Inc.*, 327 F.Supp.2d 1237, 1245 (D.Or.2004). If either plaintiff establishes a prima facie case, the burden shifts to Alderwoods to offer a legitimate, nondiscriminatory reason for the employment action. *Yartzoff*, 809 F.2d at 1375. Once Alderwoods carries this burden, then either plaintiff must demonstrate a genuine issue of material fact as to whether Alderwoods' proffered reason is a pretext. *Id.* This burden-shifting scheme applies to claims under both state and federal law. *Williams v. Federal Express Corp.*, 211

F.Supp.2d 1257, 1264 (D.Or.2002) (citation omitted).

### 2. Protected Activities

■■■ Both Jernigan and Haller satisfied the first step of the prima facie case when they reported their claims of sexual harassment to Alderwoods. Making a formal or informal complaint of discriminatory treatment constitutes protected activity for purposes of Title VII retaliation. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir.2000).

### 3. Adverse Employment Action

■■■ The second step of the prima facie case requires each plaintiff to show that she was subjected to an adverse employment action. An adverse employment action upon which a Title VII claim may be based constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *See Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257. Employment actions which do not result in changes in pay, benefits, seniority, or responsibility generally are insufficient to sustain a retaliation claim. *See Horn v. Univ. of Minnesota*, 362 F.3d 1042, 1046 (8th Cir.2004); 42 U.S.C. § 2000e–3.

Here, neither Jernigan nor Haller can show that Alderwoods subjected her to an adverse employment action. Instead, each cobbles together allegations that she was treated differently after Alderwoods investigated and terminated Baker. None of plaintiffs' allegations of retaliation rise to the level of conduct Title VII was intended to address. In the alternative, plaintiffs argue that they were construc-

---

**9.** Jernigan never complained to Human Resources about Gatchell who left Young's in October 2003.

tively discharged from their employment with Alderwoods. However, plaintiffs provide insufficient evidence that Alderwoods intended to discharge either of them, or that their working conditions were intolerable, both required elements to show a constructive wrongful discharge.

### a. Allegations of Retaliation

██ Plaintiffs argue that after they formally complained to Alderwoods Human Resources and Baker was terminated, they were subjected to retaliatory conduct. Retaliation includes conduct that a reasonable employee would have found materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern and Santa Fe Railway Co. v. White*, —— U.S. ——, ——, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (citations omitted). Each plaintiff's allegations will be considered separately.

*Jernigan*

██ Jernigan argues that Kluempke's preparation of a performance improvement plan for her was retaliatory. This argument suffers from many flaws. First, the performance plan was an incomplete draft, was never given to Jernigan, and she did not even find out about it until discovery commenced in this lawsuit. Second, there is no evidence that Kluempke knew that Jernigan instigated the investigation of Baker as of April 12, 2004, the date of the draft performance improvement plan. Finally, Kluempke had disciplined Jernigan previously for matters similar to those mentioned in the draft, i.e. having a negative reserve account and not prospecting the right mix of sales. Though Jernigan

received award certificates for meeting sales goals in 2003 and 2004, Kluempke and Alderwoods still perceived areas in which she needed to improve. Jernigan cannot show that the draft plan had a negative impact on her and represented a form of retaliation.

Jernigan also alleges that she did not receive sales calls from clients as evidence of retaliation on the part of other Alderwoods employees. She claims that the calls were redirected by Waud and Riggleman, but presents no evidence that either of them knew of her complaint at the time they allegedly redirected calls. Because she is unable to link the allegation that she did not receive calls with her complaint of sexual harassment against Baker, she cannot maintain this claim. *See Raad v. Fairbanks North Star Borough School District*, 323 F.3d 1185, 1197 (9th Cir.2003) (finding that a plaintiff must establish that the individual accused of retaliatory conduct knew about the protected activity).

Finally, Jernigan argues that Alderwoods' denial of vacation pay to her while she was on medical leave is evidence of retaliation. However, the Alderwoods employee who made the decision, Shawn Phillips ("Phillips"), was not aware of the sexual harassment investigation until Jernigan told him about it herself. Also, Phillips' decision to deny her vacation pay occurred prior to Jernigan telling him about her role in the sexual harassment complaint against Baker. Because Jernigan cannot show a causal connection between Phillips' decision to deny her vacation pay while on medical leave and her participation in the sexual harassment complaint against Baker, she fails to show retaliatory motive on the part of Alderwoods.[10]

10. Jernigan (and Haller) argue once again that Alderwoods should not have left Baker in his supervisory position during the investigation, and that Alderwoods should have made an example of Baker by revealing that his

termination was based on a finding of sexual harassment. As this argument was addressed and dismissed above, it will not be given any further analysis in the context of plaintiffs' claim of retaliation.

*Haller*

Haller argues that the reprimand she received from Alderwoods as a result of the investigation is evidence of retaliation. However, the reprimand she received was for getting upset and yelling at other employees in the workplace in violation of the Respectful Workplace Policy. Haller does not dispute that the investigation accurately revealed that she engaged in the conduct that caused Alderwoods to issue this reprimand. Simply because Haller complained of sexual harassment does not immunize her from complying with her employer's reasonable policies regarding workplace conduct. *See McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir.1996) (finding no adverse employment action where the employer enforces a generally applicable policy against an employee). Haller's reprimand is not evidence of retaliation.[11]

Haller also argues that her treatment by David LaFollette, the manager who replaced Baker, evidences retaliatory conduct. LaFollette placed disciplinary notices in Haller's file and did not investigate events that Haller described to him as instances of retaliation by other Alderwoods employees. However, Haller does not present any evidence that LaFollette knew of her complaint of sexual harassment to Alderwoods Human Resources. Without making this link, Haller cannot show that LaFollette's actions were retaliatory. *See Raad supra.* Furthermore, Haller did not know about the disciplinary notices until after she left her employment at Young's. Without knowledge of their existence, Haller cannot maintain that the disciplinary notices were reasonably likely to deter her from filing a complaint. *See Burlington Northern*, 126 S.Ct. at 2415, 126 S.Ct. 2405 (describing retaliation as conduct that would dissuade a reasonable worker from making a charge of discrimination).

Haller argues that Alderwoods failed to investigate her claims of retaliation by other Alderwoods employees after she complained of sexual harassment. Haller's complaints to LaFollette appear to be more focused on workplace disagreements than retaliatory conduct. In her conflict with Karen Franklin, for example, Haller felt Franklin had spoken to her rudely and had blamed her for tardiness in filing paperwork, a charge Haller felt was unfair. Haller presents no evidence that Franklin knew of Haller's complaint of sexual harassment against Baker. Haller also complained that Lisa Riggleman was giving her the "silent treatment." However, Alderwoods had no duty to prevent workplace rudeness or to make sure all their workers got along well together in the workplace. *See Leland v. U.S. Bank Nat'l Ass'n*, No. CV–98–454–ST, 1999 WL 778569 at *9 (D. Or. Sept 23, 1999) ("cold shouldering" is not an actionable offense under Title VII). Also, LaFollette did involve other management level employees in Haller's complaints, including faxing a complaint letter written by Haller to John Head and Brett Edgerly. Though Haller may have felt that Alderwoods' response to her complaints was inadequate, she has not established that the conduct she complained of was retaliatory.

Finally, Haller argues that Waud's late transfer is evidence of retaliation. The Alderwoods investigation committee recommended that Waud be transferred from Young's, and Waud was transferred sometime later when a funeral director position opened at another Alderwoods location. Haller presents no evidence that Waud

---

11. Haller was not singled out for discipline as a result of the investigation. Waud, Cafferky and Raney all received discipline for violations of the Policy separate from the initial sexual harassment complaint.

sexually harassed her, she made no complaints to Alderwoods that Waud sexually harassed her, and she admits that Waud never made any sexually-related comments to her. Haller also admits that her evidence of sexual harassment is against Baker only. This court fails to see how Waud's late transfer is evidence of retaliation against Haller.

### b. Constructive Wrongful Discharge

In the alternative, plaintiffs argue that this court may find an adverse employment action in their constructive wrongful discharge. Alderwoods argues that plaintiffs voluntarily resigned. Baker was terminated on May 10, 2004. Jernigan went on leave from Alderwoods on May 20, 2004 and did not return. She resigned on August 11, 2004. Haller left Alderwoods on June 11, 2004 and did not return. She resigned on September 10, 2004.

 To establish a constructive termination claim under Oregon law, a plaintiff must show that the employer intentionally created or maintained working conditions that were so intolerable that a reasonable person would have resigned because of them, that the employer knew that the employee was certain or substantially certain to leave because of the conditions, and that the employee did in fact leave because of the conditions. *McGanty v. Staudenraus*, 321 Or. 532, 557, 901 P.2d 841 (1995). Thus a plaintiff must prove that the employer acted with the intent of forcing the employee to resign. *See Ballinger v. Klamath Pacific Corp.*, 135 Or.App. 438, 453, 898 P.2d 232 (Or.Ct.App.1995). Intolerability must be present at the time that the employee resigns for a claim of constructive discharge to lie. *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir.1994), *cert. denied*, 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995).

Plaintiffs' support their constructive discharge claim with the same allegations they employ in their retaliation claim. Those allegations have been addressed and found to be insufficient as a matter of law. Those same allegations do not support a claim of constructive wrongful discharge.

Haller and Jernigan offer no direct evidence that any member of management at Alderwoods intended for either of them to resign. To the contrary, Alderwoods investigated and terminated Baker, disciplined Waud for his poor workplace conduct and eventually transferred him, thanked plaintiffs for filing their complaints with Human Resources, and replaced Baker with LaFollette, a manager who had no history with either plaintiff. LaFollette offered Haller assistance when she expressed concern about her employment situation and accommodated Haller's request for a start time later than the time he required of all other employees. While LaFollette may have found Haller's performance below his expectations at times, Haller offers no evidence that he intentionally created working conditions that were so intolerable that Haller was forced to resign because of them.

Following the March 4 complaint, sexual harassment in the workplace stopped. Plaintiffs fail to provide evidence that after the investigation, conditions became so intolerable that they were forced to quit. Plaintiffs cannot assert an adverse employment action based on allegations of constructive wrongful discharge.

### 4. Causal Connection

 Having found no adverse action, plaintiffs' retaliation claims must fail. However, even if this court were to find that Alderwoods' subjected either plaintiff to an adverse employment action, plaintiffs fail time and again to establish the necessary causal connection between their protected activity and the alleged adverse employment action.

Jernigan told him about it herself, and his decision to deny her vacation pay occurred prior to Jernigan telling him about her role in the sexual harassment complaint. Jernigan fails to provide the required evidence of a causal connection between her protected activity and an adverse employment action such that she is unable to establish a prima facie case of retaliation.

### CONCLUSION

Because plaintiffs are unable to establish a prima facie case of retaliation based on their treatment after Baker's termination, Alderwoods motion for summary judgment on plaintiffs' claims of retaliation should be granted.

### III. Wrongful Discharge

Jernigan and Haller allege that they were constructively terminated from their employment at Alderwoods and that their discharge is actionable under Oregon law. Based on the analysis laid out above, Alderwoods' motion for summary judgment on plaintiffs' claim for constructive wrongful discharge should be granted.

### IV. Negligent Supervision and Retention

■ Jernigan and Haller argue that Alderwoods was negligent in that Jernigan had reported Baker's conduct to Kluempke repeatedly beginning in 2002, and Kluempke took no action in response. Under Oregon law, an employer can be found negligent for hiring or retaining an employee. *Chesterman v. Barmon,* 82 Or. App. 1, 4, 727 P.2d 130 (Or.Ct.App.1986). "To state a cause of action in negligence, [a] plaintiff must allege that [the] defendant owed ... a duty, that [the] defendant breached that duty, and that the breach was the cause in fact of some legally cognizable damage to [the] plaintiff." *Id.* (citation omitted). "The duty to use reasonable care in hiring or retaining employees arises because it is foreseeable that the

employee, in carrying out his employment, may pose an unreasonable risk of injury to others." *Id.*

■ Alderwoods argues that it is not liable for negligence because neither Jernigan nor Haller suffered any physical injury. Under Oregon law, "a fundamental prerequisite of negligence liability ... is actual, present harm or injury." *Lowe v. Philip Morris USA, Inc.,* 207 Or.App. 532, 544, 142 P.3d 1079 (Or.Ct.App.2006) (citation omitted). In the negligence context, " 'harm' generally refers to physical injury." *Id.* at 545, 142 P.3d 1079. Exceptions to the requirement of physical injury in negligence claims include claims for negligent infliction of emotional distress, emotional distress accompanied by physical impact, and negligence for purely economic harm where the harm is predicated on a heightened duty beyond the common-law duty to exercise reasonable care to prevent foreseeable harm. *Id.* at 551–54, 142 P.3d 1079. A special relationship between the parties creates a heightened duty on the defendant's part. *Id.* at 553, 142 P.3d 1079. Here, plaintiffs do not argue for any heightened duty on Alderwoods' part and instead contend that liability flows from the general foreseeability standard. Under that standard, Jernigan and/or Haller would have to show actual harm or injury which they do not allege. Because neither Jernigan nor Haller provided evidence that she suffered physical injury as a result of sexual harassment by Baker, Alderwoods' motion for summary judgment on plaintiffs' claim for negligent supervision and retention should be granted.

### V. Sexual Battery

As stated above, in the Sixth Claim for Relief, Haller alleges that Baker committed sexual battery. In response to Alderwoods' motion for summary judgment,

Haller voluntarily dismissed that claim. The claim of sexual battery should be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2), Alderwoods' motion for summary judgment on Haller's claim of sexual battery should be denied as moot, and defendant Baker should be dismissed from this lawsuit.

## VI. Punitive Damages

█ Alderwoods argues that summary judgment is appropriate on plaintiffs' claim for punitive damages. Jernigan and Haller argue that they are entitled to punitive damages based on the conduct of Alderwoods' managers. Because only Jernigan's claim for sexual harassment should survive Alderwoods' motion for summary judgment, only Jernigan's claim for punitive damages will be addressed. Under *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535–43, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), for an employer to be liable for punitive damages in a discrimination suit, the plaintiff must show: (1) that the employer acted with the requisite mental intent, i.e. the employer knew it was acting in violation of the law; and (2) that the employees who discriminated against the plaintiff were managerial agents of the employer acting within the scope of their employment. *Id.* Even if the plaintiff can show these two elements, an employer may still escape liability for punitive damages if it can show that it engaged in good faith efforts to comply with the requirements of Title VII. *Id.* at 544–45, 119 S.Ct. 2118. Good faith efforts include an employer having anti-harassment or anti-retaliation policies in place, and conducting trainings on these policies. *See, e.g., Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858 (7th Cir.2001). It is undisputed that Alderwoods held at least one "Respectful Workplace" training in May 2004, and that plaintiffs were aware of Alderwoods' "Respectful Workplace" policies as copies of

the policies were provided to them and all employees.

█ Alderwoods argues that Jernigan has offered no evidence that Alderwoods knew it may be acting in violation of federal law. Jernigan contends that a jury could find that even though Alderwoods' management personnel were aware of the policies at the time the alleged sexual harassment was occurring, they still intentionally failed to enforce the policies. *See Equal Employment Opportunity Comm'n v. Wal–Mart Stores, Inc.*, 187 F.3d 1241, 1246 n. 3 (10th Cir.) (finding liability for punitive damages where the defendant was aware of prohibitions against workplace discrimination and had a company-wide policy designed to ensure compliance). Specifically, Jernigan points to Kluempke's failure to enforce the policy after repeated complaints from Jernigan about Baker's behavior. This court finds that Jernigan has pointed to sufficient evidence in the record to create a question of fact as to whether Alderwoods' manager, Kluempke, acted in reckless disregard of plaintiffs' rights under Title VII. *See Kolstad*, 527 U.S. at 536–37, 119 S.Ct. 2118. Alderwoods' motion to dismiss Jernigan's punitive damage claim should be denied.

## CONCLUSION

For the reasons set forth above, defendants' Motion for Summary Judgment (# 26) should be granted with respect to Haller's claim for sexual harassment under Title VII and Oregon law, both plaintiffs' claims for retaliation under Title VII and Oregon law, both plaintiffs' claims for wrongful discharge, and negligent supervision and retention. Defendants' Motion for Summary Judgment (# 26) should be denied with respect to Jernigan's claim for sexual harassment under Title VII and Oregon law. Defendants' motion for summary judgment on plaintiffs' claim for pu-

nitive damages should be denied. Defendant Baker should be dismissed from this lawsuit.

Since the court did not rely on the Declaration of Guinevere Jones in reaching its conclusion on the defendants' Motion for Summary Judgment, defendants' Motion to Supplement the Summary Judgment Record (# 60) and plaintiffs' Motion to Strike the Declaration of Guinevere Jones (# 64) are denied as moot. Defendant's Motion to Strike Plaintiff's Evidence in Support of Opposition to Motion for Summary Judgment (# 49) is granted in part and denied in part as follows: objections to Exhibits 51, 52, 55, and 61 are sustained; all other objections are overruled.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due April 18, 2006. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

April 4, 2007.